Rose JOHNSON, et al., Plaintiffs,

v.

Robert HAMRICK, et al., Defendants.

No. CIV. 291CV2WCO.

United States District Court,
N.D. Georgia,
Gainesville Division.

Aug. 7, 2001.

John Mell Clark, Office of John Mell Clark, Elberton, GA, Willie James Woodruff, Jr., Toccoa, GA, Edward Still, phv, Anita S. Hodgkiss, phv, Washington, DC, Maha S. Zaki, Montgomery, AL, Brenda Wright, phv, Boston, MA, for Plaintiffs.

Lisa D. Cooper, Office of the United States Attorney, Atlanta, GA, Joseph Rich, phv–DOJ, U.S. Department of Justice Civil Rights Division, Washington, DC, for Intervenor.

Robert Maddox Brinson, Jesse Anderson Davis, Joseph Anderson Davis, Joseph Blackshear Atkins, David Clarence Smith, Brinson Askew Berry Siegler, et al., Rome, GA, James Ernest Palmour, III, Office of James E. Palmour, Gainesville, GA, for Defendants.

### ORDER

O'KELLEY, Senior District Judge.

## I. *Procedural History*

The present action has a long and agonizing history before this court. It originally commenced on January 11, 1991. Plaintiffs, a group of black citizens of the City of Gainesville, Georgia brought suit alleging that Gainesville's at-large method of electing the city council violates § 2 of the Voting Rights Act and the United States Constitution.

Plaintiffs' motion for summary judgment was denied on January 20, 1993. A non-jury trial was held between August 31, 1994 and September 2, 1994. By order dated September 28, 1994 ("1994 order"), the court held that plaintiffs did not meet their burden of proof as articulated by the Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), and thus did not prove that Gainesville's electoral system violates § 2 of the Voting Rights Act.

■■■■■ A § 2 violation occurs when 'based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivisions are not equally open to participation by members of a [protected] class of citizens ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.' 42 U.S.C. § 1973(b).

At a minimum, Section 2 plaintiffs must prove "the three now-familiar *Gingles* factors (compactness/numerousness, minority cohesion or bloc voting, and majority bloc voting)." Other factors may, however, in the totality of circumstances, be relevant to a claim of racial vote dilution.

*Johnson v. Hamrick*, 196 F.3d 1216, 1219 (11th Cir.1999); *see also Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

In the 1994 order, this court found that although prongs one and two of *Gingles* were met, prong three was not proven. As to the first factor, the court stated as follows:

The first *Gingles* factor requires that "the minority group must be able to demonstrate that it is sufficiently large

and geographically compact to constitute a majority in a single-member district." *Gingles, supra,* at 50, 106 S.Ct. 2752. Plaintiffs have arguably established this prong of the *Gingles* tripartite test. Plaintiffs tendered a second expert witness, Mr. Jerry Wilson, who testified as a demographer that he constructed a five-district plan for the city council. His plan envisioned a black majority district (58.72% black voting-age population) and a black "influence district" (37%). Gainesville's population is approximately 20% black, and *it is not disputed* that the black residents inhabit a relatively geographically compact area. The proposed majority black district would, with some changes, incorporate the area which is currently designated as Ward 3. Defendants concede that plaintiffs can establish this element.

1994 order, p. 20 (emphasis added) (the court noted in footnote 17 "that a 58.72% minority population falls somewhat short of the range (60–65%) suggested by the United States Department of Justice.").

As to prong 2, political cohesiveness of the minority group, the court concluded as follows:

> [I]n seven out of eight contested elections, more than half of the minority group preferred the same candidate, and in five out of those seven, the minority group's preference was clearly established. This solidarity in voting patterns was particularly acute in the elections of 1985 and 1990. It appears from these figures that the plaintiffs have met their initial burden of establishing the second *Gingles* factor, political cohesiveness. That notwithstanding, the plaintiffs [sic] claim cannot succeed because they have failed to establish the third *Gingles* factor.

1994 order, p. 24.

The court found that the third prong was not met because plaintiffs were unable to demonstrate that the white majority voted sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. *See id.* at 24–26. The court also noted that even if plaintiffs were able to satisfy all three *Gingles* prongs, the totality of circumstances weighed against the finding of a § 2 violation as well. *Id.* at 27–28, 106 S.Ct. 2752. The court then declined to rule upon plaintiffs' and defendants' constitutional claims. *Id.* at 28, 106 S.Ct. 2752. Plaintiffs appealed.

The Eleventh Circuit Court of Appeals held that because this court denied relief under § 2 it was required to decide at least one of plaintiffs' constitutional causes of action and both if it denied relief on the one disposed of first. Thus, the Eleventh Circuit held that this court had not rendered a truly final judgment and dismissed the appeal for lack of appellate jurisdiction. Upon receiving the Eleventh Circuit's mandate, the court reopened the case and held an evidentiary hearing on July 11, 1997, for the limited purpose of admitting evidence of new election results occurring after the 1994 order and the expert analyses of the new election results. The court also reopened the case to consider the parties' constitutional claims in order to render a truly final judgment in the case.

On June 10, 1998, the court entered an order ("1998 order"), this time ruling in favor of the plaintiffs on the § 2 claim. The court (1) concluded that the at-large system of electing Gainesville City Council members violated § 2 of the Voting Rights Act, (2) found that § 2 of the Voting Rights Act was constitutional, and (3) declined to rule on plaintiffs' constitutional claims on the grounds that "federal courts should avoid ruling on constitutional issues when non-constitutional grounds for a de-

cision exist[.]" *Johnson v. Hamrick,* 1998 WL 476186, *10 (N.D.Ga.1998).

On appeal, the Eleventh Circuit vacated the judgment and remanded the action to this court for additional findings of fact and conclusions of law. The Eleventh Circuit did so on the ground that the court's findings of fact and conclusions of law were insufficient to support the ultimate conclusion in the case, that § 2 was violated. Specifically, the Eleventh Circuit held that further findings were needed as to the third *Gingles* prong and the totality of the circumstances analysis. *See Johnson v. Hamrick,* 196 F.3d 1216, 1223–24 (11th Cir.1999).

On remand, this court determined that present day facts were necessary to properly consider the third prong of *Gingles* and the totality of the circumstances and, thus, reopened the record. The Supreme Court has explained that

in evaluating a statutory claim of vote dilution through districting, the trial court is to consider the totality of the circumstances and to determine, *based upon a searching practical evaluation of the past and present reality,* whether the political process is equally open to minority voters. *This determination is peculiarly dependent upon the facts of each case, and requires an intensely local appraisal* of the design and impact of the contested electoral mechanisms.

*Thornburg v. Gingles,* 478 U.S. 30, 79, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986) (emphasis added).

The original bench trial in this case took place in August and September of 1994. The court held an evidentiary hearing to update the evidence in July of 1997. The most recent evidentiary hearings to update the evidence took place on June 5, 2001 and June 27, 2001. These last evidentiary hearings were especially appropriate in light of the new data from the 2000 Census, the changing demographics in the relevant area, and the elections occurring since this court's June 1998 ruling. *See also Westwego Citizens for Better Government v. City of Westwego,* 906 F.2d 1042, 1045 (5th Cir.1990) ("given the long term nature and extreme costs necessarily associated with voting rights cases, it is appropriate to take into account elections occurring subsequent to trial.") (citations omitted); *LaMarca v. Turner,* 995 F.2d 1526, 1548–49 (11th Cir.1993), *cert. denied,* 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994) (§ 1983 case; the Eleventh Circuit held that the district court had authority to reopen the record and consider new evidence when an appeal was dismissed and the case was returned, at least until the time that it entered final judgment); *United States v. Marengo County Comm'n,* 731 F.2d 1546, 1574–75 (11th Cir. 1984) (remanding voting rights case for evidentiary hearing to update and supplement the record where more than five years had passed since trial). Thus, this court permitted the parties to "submit evidence concerning relevant elections which . . . occurred since the July 11, 1998 hearing, relevant expert testimony regarding the election evidence as a whole, and relevant changes in demographic and population evidence, if any." *See* March 30, 2001 order, p. 11–12 [170–1].

At the June 5, 2001 hearing, defendants presented election data from a November 7, 2000 Special Election and a March 7, 2000 Special Election, 2000 Census data, an expert report from a demographer-Mr. Bobby M. Bowers, a supplemental expert report from an election expert-Dr. Michael A. Maggiotto, testimonial evidence from the Assistant City Manager of

Gainesville and former Director of Development of Gainesville–Mr. Bryan Schuler, and demonstrative evidence in the form of maps. Plaintiffs presented rebuttal expert evidence from Dr. Richard Engstrom.

Defendants argued that based on the change in demographics from 1991 to 2001, plaintiffs were no longer able to prove a feasible remedy or that the first prong of *Gingles,* which requires that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district, was met. Although the court had reservations about accepting evidence and argument on issues which previously had been conceded or found satisfied, it appeared that the defendants were correct and that the new evidence should be accepted as to those previously determined issues. *See U.S. v. Marengo County Commission,* 731 F.2d 1546, 1574–75 (11th Cir.1984) ("the defendants bear the burden of establishing that circumstances have changed sufficiently to make our finding of discriminatory results in 1978 inapplicable in 1984."); *see also United States v. Escobar–Urrego,* 110 F.3d 1556, 1561 (11th Cir.1997) (exception to law of the case doctrine may be made when new evidence is presented which is substantially different, there has been a change in the law, or the law of the case was clear error and would work a manifest injustice). Thus, the court permitted the evidence and allowed plaintiffs time to gather further rebuttal evidence to be presented at a later date, specifically June 27, 2001.

At the June 27, 2001 hearing, plaintiffs tendered Ms. Andrea Swansby as an expert in Geographic Information Science ("GIS") systems, who testified that based on the 2000 Census it was possible to divide Gainesville into five single-member districts of roughly equal population following existing ward boundaries such that one district would be a majority-minority district and, therefore, prong one of *Gingles* and a feasible remedy could be established. Mr. Greg Bautista and Ms. Susan Purz testified for the plaintiffs concerning the extent to which the black and Hispanic communities in Gainesville are politically cohesive. Plaintiffs also presented their own maps. The defendants called their expert, Mr. Bobby Bowers, in rebuttal.

The case is now before the court for resolution of the merits of this case.

## II. *Facts*

The City of Gainesville is located in Hall County, Georgia. Gainesville is governed by a city council comprised of five members. Each member resides in one of the city's five geographically designated wards which serve as electoral districts. Voting for city council members, however, is conducted on an at-large basis. For example, while an individual must reside in Ward 3 to run as the Ward 3 representative to the council, all registered voters in the city, regardless of which ward they reside in, are able to vote for that position. The plaintiffs in this case are black residents of Ward 3. The office of mayor rotates through the members of the city council and is, therefore, not filled by popular election. The administrative branch of Gainesville's city government is operated by a city manager who is appointed by and serves at the pleasure of the city council. City elections in Gainesville are supervised by the city clerk, who also maintains records of election results.

The current city council member representing Ward 3 is Ms. Myrtle Figueras. She is a black female. Ms. Figueras is

also the current mayor of Gainesville. Ward 3 has been represented by a black individual since 1978.

Census figures from 1990 showed that the total population of Gainesville was 17,-885. Of that total, 4,203 (23.5%) were black and 12,300 (68.8%) were white. Other racial groups, 1,382 individuals, comprised approximately 8% of the population. The total voting age population of Gainesville was 13,575 of which 2,747 (20.24%) were black and 9,831 (74.42%) were white.

Census figures from 2000 show that the total population of Gainesville is now 25,-578. Of that total, 4,023 (15.7%) are black and 16,680 (65.2%) are white. Currently, 4,875 (19.1%) individuals belong to other racial groups: "American Indian and Alaska Native," "Asian," "Native Hawaiian and Other Pacific Islander," "some other race," and those claiming "two or more races." Of the total population, 8,484 (33.2%) claim to be of Hispanic or Latino origin of any race. The total voting age population, that is those of eighteen years of age or older, in Gainesville is 19,179 of which 2,725 (14.2%) are black and 13,322 (69.5%) are white.

### III. *Remedy/First Prong of Gingles*

Defendants claim that the new demographic evidence shows that plaintiffs cannot prove a remedy and cannot satisfy prong one of *Gingles*. In *Nipper v. Smith,* 39 F.3d 1494 (11th Cir.1994) (plurality as to the result and plurality in part as to the opinion) (Tjoflat, C.J.), a § 2 vote dilution case, the Eleventh Circuit explained as follows:

> *Gingles* held that plaintiffs in vote dilution cases brought under section 2 must initially establish geographic compactness, minority cohesiveness, and white

bloc voting as preconditions to stating a valid claim. *See id.* at 50–51, 106 S.Ct. at 2766–67. Those three factors are used to evaluate two critical points: (1) the possibility of a remedy and (2) the existence of racially polarized, legally significant racial bloc voting.

> The first *Gingles* precondition, informed by the second, dictates that the issue of remedy is part of the plaintiff's prima facie case in section 2 vote dilution cases. As the Supreme Court has explained, "[t]he 'geographically compact [minority]' and 'minority political cohesion' showings [in the *Gingles* threshold test] are needed to establish that the minority has the potential to elect a representative of its own choice from some single-member district." *Growe v. Emison,* 507 U.S. 25, 113 S.Ct. 1075, 1084, 122 L.Ed.2d 388 (1993) (citing *Gingles,* 478 U.S. at 50, n. 17, 106 S.Ct., at 2765, n. 17). The inquiries into remedy and liability, therefore, cannot be separated: A district court must determine as part of the *Gingles* threshold inquiry whether it can fashion a permissible remedy in the particular context of the challenged system.

*Nipper v. Smith,* 39 F.3d at 1530–31 (plurality). *See also Burton v. City of Belle Glade,* 178 F.3d 1175, 1199 (11th Cir.1999) ("We have repeatedly construed the first *Gingles* factor as requiring a plaintiff to demonstrate the existence of a proper remedy.").

### A. *Feasibility of Proposed Districts as Remedy*

■ At the June 27, 2001 hearing, plaintiffs presented Ms. Andrea M. Swansby, a geographer and cartographer employed by Metropolitan Area Research Corporation ("MARC") located in Minneapolis, Minne-

sota. Ms. Swansby has a Bachelor of Science degree in Geography and is pursuing her Masters of Geographic Information Science at the University of Minnesota. Although Ms. Swansby has completed all of her course work for her Masters degree, her advisors have not yet met to award her the official certificate. Ms. Swansby has experience as a GIS Specialist and Project Manager, a GIS Manager, and an Undergraduate Research Assistant. While working for MARC, she has worked on, *inter alia*, a project involving elementary schools in Atlanta and a project creating proposed redistricting maps in Minnesota based on 2000 Census data.[1] She created all of the maps submitted by the plaintiffs at the June 27, 2001 evidentiary hearing.

Ms. Swansby opined as follows:

[A] single member five district plan can be drawn respecting all redistricting guidelines which results in the [proposed city council district] map. It is possible to draw five single-member districts that are roughly equal in population, that follow existing ward boundaries, that do not pair incumbent city council members, and that recognizes communities of interest such that one district is majority-minority in population and voting age population, and majority black in voter registration.

*See* June 27, 2001 Hearing, Pl.s' Ex. 4, ¶ 3. The proposed majority-minority district is Proposed District 3. In creating the proposed city council district map, *see* June 27, 2001 Hearing, Pl.s' Ex. 5, Ms. Swansby used GIS software and inputted 2000 Census data, Census block boundaries, the list of active voters as given by the Georgia Secretary of State, and communities of

interest as indicated by the location of public housing, toxic release inventory facilities, and EPA reported facilities. She also claimed to have followed Georgia's Guidelines for Redistricting—*see* June 27, 2001 Hearing, Pl.s' Ex. 3.

Defendants argue that the design of the proposed districts violates Georgia law, specifically O.C.G.A. § 36–35–4.1(b)(1), which requires that reapportioned election districts for municipal elections "be formed of contiguous territory[.]" Defendants conclude, therefore, that the proposed districts are impermissible and plaintiffs have failed to establish part of their prima facie case.

The court does recognize the contiguity requirement of § 36–35–4.1(b)(1) and the fact that the proposed districts do not conform with said requirement. Although Gainesville's boundaries are oddly shaped and some portions upon first glance appear non-contiguous, it is not disputed that all portions are contiguous and that portions which appear to be non-contiguous are contiguous to the city by at least a road. Ms. Swansby admitted that her proposed districts contained areas which, although were close to one another in her judgment, were not contiguous. She explained that from her examination of the city boundaries she was under the impression that certain areas of Gainesville were not contiguous to any other part of the city. Thus, she included those areas with truly non-contiguous districts to achieve the majority-minority district. *See* June 27, 2001 Tr., p. 41–45. However, Ms. Swansby's assumption was wrong. Each portion of the city is contiguous to the rest of the city, even if by a mere road.

Although the court agrees that compliance with state law and traditional district-

---

**1.** Defendants objected to the use of Ms. Swansby as an expert; the court overruled the objection. *See also* Def.s' Formal Obj. [191–1].

ing principles, which include contiguity, is of immense importance when imposing a remedy, the court finds that the non-contiguous aspect of the proposed districts is not fatal to plaintiffs' § 2 claim in this case. In *Burton v. City of Belle Glade,* 178 F.3d 1175, 1200 (11th Cir.1999), *reh'g en banc denied,* 193 F.3d 525 (1999), the Eleventh Circuit examined the district court's conclusion that the remedy of court-ordered annexation was inappropriate on the facts presented therein. The Eleventh Circuit agreed with the district court and noted that "this conclusion in no way rests on a determination that Florida law prohibits [such] annexation .... Indeed, we agree with the parties that where federal statutory or constitutional rights have been violated, state law will not impede a court from fashioning an appropriate remedy." *Id.* at 1200; *see also Shaw v. Reno,* 509 U.S. 630, 647, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (where reapportionment plan was challenged as violating the Equal Protection Clause; the Supreme Court explained that traditional districting principles such as compactness, contiguity, and respect for political subdivisions "are important not because they are constitutionally required—they are not—but because they are objective factors that may serve to defeat a claim that a district has been gerrymandered on racial lines.") (citations omitted).

In the instant case, the city's boundaries are rough and asymmetrical. The proposed districts, for the most part, do not contain non-contiguous areas separated by an intervening district. Instead, where the proposed districts contain non-contiguous portions, the non-contiguous portions are separated by unincorporated areas and are relatively near the districts to which they are joined. The proposed districts as drawn do not present a case of spoke or measles districting where pockets of minority populations are included in the same district although they are separated geographically and would otherwise more logically be included in the surrounding district. Thus, the court finds that while the failure to strictly adhere to the contiguity requirements of § 36–35–4.1(b)(1) may be a matter for consideration in determining the feasibility of a remedy, it does not itself defeat plaintiffs' § 2 claim under the present circumstances.

## B. *Geographic Compactness*

In 1994 it was not disputed that the black residents inhabited a relatively geographically compact area or that plaintiffs could establish the first *Gingles* prong. Plaintiffs' proposed remedy at that time was (1) to make only minor boundary changes to the wards, thereby leaving the ward boundaries essentially intact, and (2) to change the election procedure from at-large voting to single-member district voting. Ward 3 with minor boundary changes would have become 58.7% black and, therefore, a majority-minority district with the potential to elect a representative of its own choice from its own district. However, during the recent evidentiary hearing, the evidence presented indicated that under the present circumstances the black population may not be sufficiently geographically compact and, therefore, that a feasible remedy may not be possible.

Defendants presented evidence in map form which shows the ratio of black residents to the total population in each Census block within the City of Gainesville. Defense witness Mr. Bryan Schuler, the current Gainesville Assistant City Manager and former Gainesville Director of Development & Planning, testified that as the Development & Planning Director he made recommendations on land use, man-

aged building and construction activities, coordinated promotional activities for the 2000 Census, and assisted in various 2000 Census activities, including reviewing street address lists for accuracy, providing assistance during the Census, and reviewing Census results. He testified that a single-member district could not be drawn to be a majority-black district. The only way such a district could be drawn would be to connect various non-contiguous black populations throughout the city in a spoke-like fashion.

On cross examination, Mr. Schuler admitted that he used his personal judgment in determining what constituted a "significant" black population that could be included in a single-member district. He did not use mathematical, statistical, or scientific formulas in concluding that a majority-minority district could not be drawn.

As discussed above, plaintiffs presented Ms. Swansby as their expert. Ms. Swansby presented a proposed district scheme which allegedly included a majority-minority district. The demographic breakdown of each proposed city council district is as follows: [2]

**Proposed District 1**

| | | |
|---|---|---|
| Total Population: | 5,282 | |
| Black Population: | 422 | (8.0%) |
| Black/Non–Hispanic Population: | 414 | (7.8%) |
| Hispanic Population: | 534 | (10.1%) |
| Hispanic & Black/Non–Hispanic Population: | 948 | (17.9%) |
| White/Non–Hispanic Population: | 4,264 | (80.7%) |
| | | |
| Total Adult [3] Population: | 4,080 | |
| Adult Black Population: | 252 | (6.2%) |
| Adult Black/Non–Hispanic Population: | not given | |
| Adult Hispanic Population: | not given | |
| Adult Hispanic & Black/Non–Hispanic Population: | 597 | (14.6%) |
| Adult White/Non–Hispanic Population: | 3,431 | (84.1%) |
| | | |
| Total Registered Voters: | 3,630 | |
| Black Registered Voters: | 194 | (5.3%) |
| Black/Non–Hispanic Registered Voters: | not given | |
| Hispanic Registered Voters: | not given | |
| Hispanic & Black/Non–Hispanic Registered Voters: | not given | |
| Black & Hispanic Registered Voters: | 216 | (6.0%) |
| White/Non–Hispanic Registered Voters: | not given | |
| White Registered Voters: | 3,367 | (92.8%) |

**Proposed District 2**

| | | |
|---|---|---|
| Total Population: | 5,262 | |
| Black Population: | 579 | (11%) |
| Black/Non–Hispanic Population: | 571 | (10.9%) |
| Hispanic Population: | 2,361 | (44.9%) |
| Hispanic & Black/Non–Hispanic Population: | 2,932 | (55.8%) |
| White/Non–Hispanic Population: | 2,262 | (43.0%) |
| | | |
| Total Adult Population: | 3,902 | |
| Adult Black Population: | 370 | (9.5%) |

**2.** *See* June 27, 2001 Hearing, Pl.'s Ex. 4–E, 4–F, 4–G.

**3.** Adult includes those who are 18 years of age or older or the "Voting Age Population."

| | | |
|---|---|---|
| Adult Black/Non–Hispanic Population: | not given | |
| Adult Hispanic Population: | not given | |
| Adult Hispanic & Black/Non–Hispanic Population: | 1,933 | (49.5%) |
| Adult White/Non–Hispanic Population: | 1,906 | (48.8%) |

| | | |
|---|---|---|
| Total Registered Voters: | 1,143 | |
| Black Registered Voters: | 151 | (13.2%) |
| Black/Non–Hispanic Registered Voters: | not given | |
| Hispanic Registered Voters: | not given | |
| Hispanic & Black/Non–Hispanic Registered Voters: | not given | |
| Black & Hispanic Registered Voters: | 168 | (14.7%) |
| White/Non–Hispanic Registered Voters: | not given | |
| White Registered Voters: | 938 | (82.1%) |

**Proposed District 3**

| | | |
|---|---|---|
| Total Population: | 4,888 | |
| Black Population: | 2,367 | (48.4%) |
| Black/Non–Hispanic Population: | 2,345 | (48.0%) |
| Hispanic Population: | 1540 | (31.5%) |
| Hispanic & Black/Non–Hispanic Population: | 3885 | (79.5%) |
| White/Non–Hispanic Population: | 808 | (16.5%) |

| | | |
|---|---|---|
| Total Adult Population: | 3,524 | |
| Adult Black Population: | 1,676 | (47.6%) |
| Adult Black/Non–Hispanic Population: | not given | |
| Adult Hispanic Population: | not given | |
| Adult Hispanic & Black/Non–Hispanic Population: | 2,662 | (75.5%) |
| Adult White/Non–Hispanic Population: | 720 | (20.4%) |

| | | |
|---|---|---|
| Total Registered Voters: | 1,111 | |
| Black Registered Voters: | 859 | (77.3%) |
| Black/Non–Hispanic Registered Voters: | not given | |
| Hispanic Registered Voters: | not given | |
| Hispanic & Black/Non–Hispanic Registered Voters: | not given | |
| Black & Hispanic Registered Voters: | 888 | (79.9%) |
| White/Non–Hispanic Registered Voters: | not given | |
| White Registered Voters: | 169 | (15.2%) |

**Proposed District 4**

| | | |
|---|---|---|
| Total Population: | 5,015 | |
| Black Population: | 407 | (8.1%) [4] |
| Black/Non–Hispanic Population: | 372 | (7.4%) |
| Hispanic Population: | 2,920 | (58.2%) |
| Hispanic & Black/Non–Hispanic Population: | 3,292 | (65.6%) |
| White/Non–Hispanic Population: | 1,573 | (31.4%) |

| | | |
|---|---|---|
| Total Adult Population: | 3,595 | |
| Adult Black Population: | 257 | (7.1%) |
| Adult Black/Non–Hispanic Population: | not given | |
| Adult Hispanic Population: | not given | |
| Adult Hispanic & Black/Non–Hispanic Population: | 2,141 | (59.6%) |
| Adult White/Non–Hispanic Population: | 1,336 | (37.2%) |

---

4. According to the court's calculations, the correct percent is 8.1%. However, plaintiffs' Exhibit 3–E lists 8.0%.

| | | |
|---|---|---|
| Total Registered Voters: | 1,334 | |
| Black Registered Voters: | 267 | (20.0%) |
| Black/Non–Hispanic Registered Voters: | not given | |
| Hispanic Registered Voters: | not given | |
| Hispanic & Black/Non–Hispanic Registered Voters: | not given | |
| Black & Hispanic Registered Voters: | 303 | (22.7%) |
| White/Non–Hispanic Registered Voters: | not given | |
| White Registered Voters: | 971 | (72.8%) |

**Proposed District 5**

| | | |
|---|---|---|
| Total Population: | 5,104 | |
| Black Population: | 414 | (8.1%) |
| Black/Non–Hispanic Population: | 405 | (7.9%) |
| Hispanic Population: | 1,005 | (19.7%) |
| Hispanic & Black/Non–Hispanic Population: | 1,410 | (27.6%) |
| White/Non–Hispanic Population: | 3,456 | (67.7%) |
| | | |
| Total Adult Population: | 4,081 | |
| Adult Black Population: | 235 | (5.8%) |
| Adult Black/Non–Hispanic Population: | not given | |
| Adult Hispanic Population: | not given | |
| Adult Hispanic & Black/Non–Hispanic Population: | 916 | (22.4%) |
| Adult White/Non–Hispanic Population: | 2,978 | (73.0%) |
| | | |
| Total Registered Voters: | 2,555 | |
| Black Registered Voters: | 138 | (5.4%) |
| Black/Non–Hispanic Registered Voters: | not given | |
| Hispanic Registered Voters: | not given | |
| Hispanic & Black/Non–Hispanic Registered Voters: | not given | |
| Black & Hispanic Registered Voters: | 156 | (6.1%) |
| White/Non–Hispanic Registered Voters: | not given | |
| White Registered Voters: | 2347 | (91.9%) |

Ms. Swansby testified that it was possible to create a majority-minority district, specifically Proposed District 3, by combining the Hispanic and black populations. The June 27, 2001 hearing is the first occasion in the ten year history of this case that plaintiffs have asserted that blacks and Hispanics need to be combined in order to create a majority-minority district. The court notes that there are no Hispanic plaintiffs in this action. Ms. Swansby admitted that a majority-black district could not be drawn within the Redistricting Guidelines and that such a district could be drawn only by joining non-contiguous black populations in a spoke-like fashion.[5]

In Proposed District 3, blacks would comprise 48.4% of the total population, 47.6% of the voting age population, and 77.3% of the registered voter population. "The [Supreme] Court has thus far declined to answer directly the question of

**5.** The court notes that neither plaintiffs nor defendants submitted any evidence as to the demographics of Ward 3 as currently drawn. In paragraph 13 of plaintiffs' supplemental statement of proposed findings of fact and conclusions of law [185–1], plaintiffs claim that "[a]s of November 3, 2000, there were 1064 registered voters (active and inactive) in Ward 3, out of a total of 1278. Black voters were 83.25% of the total registered voters in Ward 3." Plaintiffs cite Defendants Exhibit 5 as authority for this assertion. However, Defendants Exhibit 5 was never entered into evidence. Thus, there is no evidence supporting plaintiffs' assertion as to the current demographics of Ward 3. The court assumes that Ward 3 as currently drawn or with the minor changes originally proposed in 1994 could not amount to a black/majority district.

'which characteristic of minority populations (e.g., age, citizenship) ought to be the touchstone for proving a dilution claim.' However, the Court has said that the foundational inquiry for the first *Gingles* precondition is whether 'the minority has the potential *to elect* a representative of its own choice in some single-member district.'" *Negron v. City of Miami Beach,* 113 F.3d 1563, 1569 (11th Cir.1997) (quoting *Johnson v. De Grandy,* 512 U.S. 997, 1008, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994), and *Growe v. Emison,* 507 U.S. 25, 39, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993) respectively).

In *Negron v. City of Miami Beach,* 113 F.3d 1563 (11th Cir.1997), the Eleventh Circuit examined whether voting age citizenship population statistics were properly considered instead of voting age population statistics and concluded that such statistics were relevant under the facts of that case. The *Negron* court addressed its decision in *Solomon v. Liberty County, Florida,* 899 F.2d 1012 (11th Cir.1990) (plurality). Noting that the court split evenly on other issues in *Solomon,* the *Negron* court recognized that "every member of the *Solomon* Court agreed that the district court had erred in focusing on registered voter statistics instead of voting age population statistics." *Negron,* 113 F.3d at 1568 (citing *Solomon,* 899 F.2d at 1018 (Kravitch, J., specially concurring); *Solomon v. Liberty County, Florida,* 865 F.2d 1566, 1574 (11th Cir.1988) (Tjoflat, J.), *vacated and reh'g en banc granted,* 873 F.2d 248 (11th Cir.1989)). The *Solomon* decisions provided that "voting age population statistics were preferable to registered voter statistics because minority voter registration might well have been suppressed by the absence of any prospect of electing representatives of the minority's choice." *Negron,* 113 F.3d at 1568 (citations omitted).

The instant case presents facts unique from those presented in previous Eleventh Circuit cases on the issue of whether registered voter population is relevant and reliable. The Eleventh Circuit has held that voter registration statistics are unreliable because voter registration may have been suppressed. Those cases involved facts where the voter registration percentage was lower than the voting age population percentage. Here the total black population and the total black voting age population in Proposed District 3 are insufficient to constitute a majority while the black registered voter population is 77.3% and, therefore, sufficient to constitute a majority.

Plaintiffs argue that in this case, black registered voter population is the relevant population because it demonstrates that blacks do have the potential to elect a representative of their own choice in the Proposed District 3. They claim that "[s]ince a plurality of the voting age population and a clear majority of registered voters in [Proposed] District 3 are Black, Black voters in that district would have the opportunity to elect a representative of choice." *See* Pl.s' Supp. Proposed Find. Fact & Concl. Law [185–1], ¶ 8.

In regard to the black voting age population, the population generally accepted as legally relevant, it is clear that blacks could not constitute a majority of the voting age population in Proposed District 3, and, thus, plaintiffs have failed to satisfy prong one of *Gingles. See also* June 27, 2001 hearing, cross-examination of Ms. Swansby, p. 50 (Question: "Isn't it true that you could not put together a 50–percent black population district?" Answer: "I couldn't—that's correct, not without including areas that were, like you said, the concentrated areas that were obviously not contiguous.")

The court declines to decide the question of whether the black registered voter population is sufficient to satisfy prong 1. Even if that population is deemed relevant, plaintiffs cannot satisfy the third prong of *Gingles* as discussed *infra*.

■ Plaintiffs alternatively claim that the black voting age population in combination with the Hispanic voting age population would constitute a sufficient majority-minority district at 75.5%. Although minority groups may be combined to form a single majority-minority district, *see Concerned Citizens of Hardee County v. Hardee County Board of Commissioners*, 906 F.2d 524, 526 (11th Cir.1990), and it appears that the black and Hispanic communities are geographically compact, the court rejects the combination in this case because plaintiffs have not presented evidence sufficient to show that blacks and Hispanics are politically cohesive, as discussed below, under the second prong of *Gingles*.[6]

## IV. *Second Prong of Gingles*

### A. *Political Cohesiveness of Blacks and Hispanics*

In *Growe v. Emison*, 507 U.S. 25, 41, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993), the Supreme Court addressed the importance of showing political cohesion when combining minorities. It stated as follows: "Assuming (without deciding) that it was permissible for the District Court to combine distinct ethnic and language minority groups for purposes of assessing compliance with § 2, when dilution of the power of such an agglomerated political bloc is the basis for an alleged violation, proof of minority political cohesion is all the more essential."

To show political cohesion of the black and Hispanic communities in Gainesville, plaintiffs presented two witnesses, Mr. Greg Bautista and Ms. Susan Purz. Mr. Bautista is a Hispanic resident of Gainesville and is the Assistant Director of the Hispanic pilot project, "El Puente" (The Bridge), for the Georgia Campaign for Adolescent Pregnancy Prevention. He testified to the following examples of black and Hispanic political cohesion: (1) participation of blacks and Hispanics at a meeting to learn more about the Community Development Bloc Grant Program; (2) concentrated location of toxic release inventory sites in Hispanic and black communities signifying their community of interest on that issue; (3) cooperation between himself and the "Newtown Florist Club," a civil rights organization, regarding environmental concerns and "toxic tours" (where the Newtown Florist Club would take a van of people "throughout the neighborhood and point out people who have been affected by toxins in their environment;") *see* June 27, 2001 Tr., p. 63; (4) collaboration of blacks and Hispanics in holding the annual Peach March, a march which primarily involves "Hispanic youth ages 18 to about 27 who want to

---

**6.** Moreover, by including the Hispanic population with the black population and making the distinction between the black population and the black-non-Hispanic population, it only seems appropriate that the relevant white population would be the white-non-Hispanic population. Doing so changes the landscape of this lawsuit, however. The white-non-Hispanic population does not constitute a majority of the city's total population. The 2000 Census figures reflect that 12,218 individuals constitute the white-non-Hispanic population, that is 47.8% of the city's total population. The white-non-Hispanic voting age population consists of 10,298 individuals, or 53.7% of the voting age population. Neither plaintiffs nor defendants have addressed this issue.

mobilize and cast light on issues that are important to them[;]" (5) collaboration of black youth, Hispanic youth, and senior citizens in conducting the "Community Engagement Process Survey" which surveyed the community to obtain data of "health indicators and health statistics;" and (6) participation of blacks and Hispanics in the 2000 Census Participation Committee which met monthly in the year leading up to the 2000 Census. He also testified to his recollection of personally attending political rallies in support of Rose Johnson, a plaintiff in this action, while he was in high school. Mr. Bautista recalled going with his father and others from the Latin community in support of Ms. Johnson, a black candidate from Ward 3. On cross-examination, Mr. Bautista admitted that he had no knowledge of Hispanic voting patterns except his personal experience. *See* June 27, 2001 Tr., p. 68.

Plaintiffs also called Ms. Susan Purz, a white resident of Gainesville who is employed at Johnson High School as a School Counselor and at the Newtown Florist Club and is an ordained Baptist minister. She testified that she helped organize a "community construction program" in which Hispanic, black, and "European American" youth participated. She also testified that she attends "a lot of the functions that the Newtown Florist Club has which includes, always includes Hispanic persons usually on the program, as well." June 27, 2001 Tr., p. 71. She testified that black, Hispanic, and white ministers began meeting regularly in 1998 regarding community issues; that blacks and Hispanics worked together on the Peace March; that blacks and Hispanics participated in a community meeting regarding racial profiling; that blacks and Hispanics both lived in concentrated numbers near an area of factories which emit toxins. *See* June 27, 2001 Tr., p. 73–74.

As an initial matter, the court notes that in the ten year history of this case, plaintiffs have never raised the issue of combining the black and Hispanic populations prior to the June 27, 2001 hearing. Nevertheless, the court allowed plaintiffs to present their evidence on it. Additionally, the court notes that there are no Hispanic plaintiffs in this action.

The court finds the evidence of Mr. Bautista and Ms. Purz to be anecdotal at best. They testified to individual instances where *de minimis* numbers of blacks and Hispanics [7] worked on community projects together, only one of which related to black and Hispanic voters supporting or working for the same candidate. Moreover, Mr. Bautista's recollection of attending political rallies while in high school with "others in … the Latin community" in support of Ms. Johnson was vague and unsubstantial. Ms. Purz herself, a white woman, evidenced white participation in black and Hispanic community affairs. However, her participation no more indicates political cohesion of blacks and whites than her testimony of a few black and Hispanic individuals attending the same meetings indicates political cohesion of blacks and Hispanics. Plaintiffs presented absolutely no statistical evidence that blacks and Hispanics voted together

---

7. Census figures reflect that 8,484 individuals, or 33.2% of the total Gainesville population, are Hispanic and 3,953 individuals, or 15.5% of the total Gainesville population are black. Neither witness gave concrete numbers for attendance at the events to which they testified. At one point, Mr. Bautista testified to meetings of Hispanics and blacks where "20 to 30 people" were present. *See* June 27, 2001 Tr., p. 66.

in any election, and this court will not indulge the presumption that blacks and Hispanics vote together merely because a few have worked together on various, non-electoral, community issues.

Thus, the court concludes that plaintiffs have not proven that Hispanics and blacks behave in a politically cohesive manner. This ends the court's § 2 inquiry as to Hispanics and blacks as a combined minority group.

### B.  *Political Cohesion of Blacks*

■  Although the court has found that plaintiffs have failed to satisfy prong one of *Gingles* in regard to the black voting age population, for the sake of thoroughness and because this court did not decide the issue of whether the black registered voter population was sufficient to satisfy prong 1, the court shall consider whether prong two has been met in regard to the black population.

The Eleventh Circuit has suggested that over 70% estimated minority support for a given candidate is sufficient to establish political cohesiveness as a matter of law. See *Solomon*, 899 F.2d 1012, 1019–20 (11th Cir.1990) (plurality).  As discussed more fully below, out of eleven endogenous elections, over 70% of black voters voted for

8.  In 1985, 72.7% voted for Lawson in Ward 5; in 1989, 85.1% voted for West in Ward 1; and in 1990, 71.8% voted for Hamrick in Ward 2.

9.  In 1989, 68.8% voted for Hayes in Ward 4; in 1990, 66.2% voted for Johnson in Ward 3; in 1995, 69.7% voted for Johnson in Ward 3; and ·in March 2000, 68.0% voted for Lawson in Ward 5.

10.  In 1986, 52.2% voted for Waters in Ward 4; in the 1986 Ward 1 runoff, 54.4% voted for

the same candidate in three out of eleven elections.[8]  In four other elections, black support for the same candidate exceeded 66%.[9]  In three additional elections, black support for the same candidate exceeded 50%.[10]  In the remaining election for Ward 1 in 1986, the minority vote split three ways, and, therefore, no preference was established.  Therefore, in ten out of eleven contested elections, more than half of black voters preferred the same candidate, and in seven of those ten, the black preference was clearly established.  Thus, the court concludes that the second prong of *Gingles*, political cohesion, is satisfied as to the black population.

### V.  *Third Prong of Gingles*

### A.  *Election Evidence*

At the June 5, 2001 hearing, Dr. Maggiotto testified for the defense as to the two endogenous[11] elections which took place after the 1997 evidentiary hearing and his expert opinion on the election evidence as a whole.  He employed homogeneous precinct analysis whereby voting results from precincts that are at least 90 percent black or 90 percent white are analyzed.  Dr. Maggiotto estimated the following election results from the 2000 elections:

Dobbs;  and in November 2000, 61.2% voted for Musselwhite in Ward 1.

11.  "Endogenous" elections are those which pertain to Gainesville City Council elections. "Exogenous" elections are those in which Gainesville voters participate but do not pertain to the Gainesville City Council, including *inter alia* county elections, gubernatorial elections, presidential elections, etc.

* denotes black candidate

| Date | Ward/Candidate | White Votes | Black Votes |
|---|---|---|---|
| 3/7/00 | Ward 5 | | |
| | Geyer | 50.5% | 32.0% |
| | Lawson–Win | 49.5% | 68.0% |
| 11/7/00 | Ward 1 | | |
| | Ellard | 28.9% | 13.4% |
| | Miller | 12.5% | 25.4% |
| | Musselwhite–Win | 58.6% | 61.2% |

Dr. Maggiotto concluded that a majority of black voters supported the winners in the 2000 elections. Below is the endogenous election data already of record:

* denotes black candidate

| Date | Ward/Candidate | White Votes | Black Votes |
|---|---|---|---|
| 11/7/95 [12] | Ward 3 | | |
| | Johnson * | 5.4% | 69.7% |
| | Morrow *–Win | 94.6% | 30.3% |
| 1990 | Ward 2 | | |
| | Hamrick–Win | 73.5% | 71.8% |
| | Williams | 26.5% | 28.2% |
| 1990 | Ward 3 | | |
| | Johnson * | 13.2% | 66.2% |
| | Morrow *–Win | 86.8% | 33.8% |
| 1989 | Ward 1 | | |
| | Baker | 8.4% | 10.3% |
| | West–Win | 68.7% | 85.1% |
| | Wiginton | 22.9% | 4.6% |
| 1989 | Ward 4 | | |
| | Hayes | 31.4% | 68.8% |
| | Wangemann–Win | 68.6% | 31.2% |
| 1986 | Ward 1 | | |
| | Bearden | 16.9% | 25.8% |
| | Dobbs–Win | 44.3% | 37.1% |
| | Moore–Win | 38.7% | 37.1% |
| 1986 | Ward 1 Runoff | | |
| | Dobbs | 49.6% | 54.4% |
| | Moore–Win | 50.4% | 45.6% |
| 1986 | Ward 4 | | |
| | Wangemann–Win | 52.8% | 47.7% |
| | Waters | 47.2% | 52.2% |
| 1985 | Ward 5 | | |

| Date | Ward/Candidate | White Votes | Black Votes |
|---|---|---|---|
| | Allison | 37.8% | 20.8% |
| | Canupp | 12.1% | 6.6% |
| | Lawson–Win | 50.1% | 72.7% |

Dr. Maggiotto concluded that the above election data, excluding the 1995 election as explained in footnote 12 and excluding the 1986 Ward 1 three-way race which did not produce a preference, shows that of the nine contested elections he evaluated with homogeneous precinct analysis, the candidate favored by at least a majority of the black electorate of Gainesville won five times or 55.6% of the time: Lawson (Ward 5, 1985), West (Ward 1, 1989), Hamrick (Ward 2, 1990), Lawson (Ward 5, 2000), and Musselwhite (Ward 1, 2000). Thus, he ultimately concluded that the electoral choices of black voters in Gainesville, Georgia are not usually defeated by white bloc voting. Moreover, Dr. Maggiotto noted that in the 1986 Ward 1 Runoff election and the 1986 Ward 4 election, the winning candidate garnered 50.4% and 52.8% respectively of the white vote. He argued that one or both of these elections could be excluded from analysis because the white vote did not sufficiently constitute a "voting bloc." If both elections are removed from the analysis, the candidate favored by a majority of the black electorate of Gainesville won in five of seven elections or 71.4% of the time, further bolstering the conclusion that the electoral choices of black voters in Gainesville, Georgia are not usually defeated by white bloc voting.

12. In analyzing the election data from the 1995 Morrow–Johnson election, Dr. Maggiotto concluded that under homogenous precinct analysis, a black precinct of 90% or more could not be found. Only Precinct 2, which contained a concentration of 86.7% of black voters, approached the 90% threshold. Dr. Magiotto could not estimate a black preference and, thus, could not determine whether a black preference succeeded or failed in this election. Accordingly, Dr. Maggiotto excluded the 1995 election from his analysis. However, Dr. Maggiotto acknowledged that social scientists do homogenous precinct analysis with homogenous precincts as low as 80%. See July 11, 1997 Tr., p. 91. Dr. Engstrom, plaintiffs' expert, did include the 1995 election in his homogenous analysis. The court agrees that 86.7% is sufficient to support the use of homogenous precinct analysis of this election. The percentages listed for 1995 are as previously given by Dr. Engstrom.

At the June 5, 2001 hearing, plaintiffs presented their expert Dr. Richard Engstrom in rebuttal. Although Dr. Engstrom did not perform his own homogenous precinct analysis of the new elections as he had done for prior hearings, he did respond to Dr. Maggiotto's analysis and conclusion. Dr. Engstrom asserts that Dr. Maggiotto's analysis and conclusion are flawed. Dr. Engstrom claims that the 2000 elections are irrelevant because neither offered the voters the choice of a black candidate. Additionally, he asserts that because the November 7, 2000 election was not a split-preference election,[13] it is not probative. As for the March 7, 2000 election, Dr. Engstrom argues that if Dr. Maggiotto's analysis had been based on voter turnout and absentee votes rather than active registered voters, Lawson would have been the candidate of choice for white and black voters, and, thus, the election would also not be probative because it was not a split-preference election. *See* Response by Richard L. Engstrom, June 5, 2001 Hearing, Pl.s' Ex. 1., ¶¶ 10, 11. However, plaintiffs have not submitted any evidence supporting Dr. Engstrom's opinion on that point. Dr. Engstrom, excluding for the above reasons the March 7, 2000 Geyer–Lawson election where the black preference defeated the white preference, concluded that although white voters can elect their candidate of choice every election, black voters can elect their candidate of choice only if it is a white versus white election and the black choice is the same as the white choice.

Also of record are the 41 exogenous elections reviewed by the court in its 1994 order. Black voters expressed a preference in 39 of the 41 elections. Of the 39 elections where a black preference was established, the black preference prevailed 26 times, or 66.7% of the time. The court reviewed 28 additional exogenous elections in its 1998 order. Black voters expressed a preference in 27 of those elections and prevailed in 16 of those 27 elections, or 59.3% of the time. No exogenous election evidence was presented at the June 2001 hearings.

## B. *Factual Findings Regarding Election Evidence*

The candidate preferred by at least a majority of black voters prevailed in five of the 11 endogenous elections, or 45.5% of the time, and lost in five of the 11 elections, also 45.5% of the time. In one election, the 1986 Bearden–Dobbs–Moore election, no candidate received in excess of 50% of black or white votes and, thus, presented no preference for black or white voters. The court does note, however, that the two candidates who proceeded to the runoff were the two candidates favored by black and white voters.[14] In two of the five elections in which the candidate preferred by white voters defeated the candidate preferred by black voters the winning candidate received 50.4% of the white vote and 45.6% of the black vote (1986 Dobbs–Moore Runoff election) and 52.8% of the white vote and 47.7% of the black vote (1986 Wangemann–Waters election). In four of the five elections in which the candidate preferred by black voters won, the winning candidate was also the candi-

---

13. A split-preference election is one in which white and black voters prefer different candidates.

14. Dobbs received 44.3% of the white vote and 37.1% of the black vote. Moore received 38.7% of the white vote and 37.1% of the black vote. Bearden, who did not proceed to the runoff, received 16.9% of the white vote and 25.8% of the black vote.

date preferred by at least a majority of white voters. In one of the five elections in which the candidate preferred by black voters won, the winning candidate was not the candidate preferred by a majority of white voters.

Of the 11 elections, two involved black candidates—the 1995 Johnson–Morrow election and the 1990 Johnson–Morrow election. Both candidates were black. In the 1995 Johnson–Morrow election, Johnson obtained 69.7% of the black vote while Morrow, the winner, obtained 94.6% of the white vote. In the 1990 Johnson–Morrow election, Johnson obtained 66.2% of the black vote while Morrow, the winner, obtained 86.8% of the white vote. These two elections present the most polarized voting data.

In the following split-preference elections, that is those in which black and white voters preferred different candidates, a split-preference was clearly established: (1) 1995 Johnson–Morrow election: black votes—69.7% to Johnson, white votes—94.6% to Morrow; (2) 1990 Johnson–Morrow election: black votes—66.2% to Johnson, white votes—86.8% to Morrow; and (3) 1989 Hayes–Wangemann election: black votes—68.8% to Hayes, white votes—68.6% to Wangemann. The candidate of choice of black voters was defeated in three of the three clearly established split-preference elections.

Three other elections exhibit a slim preference, in regard to the white or black preference and, thus, arguably constitute split-preference elections: (1) 03/07/00 Geyer–Lawson election: black votes—68.0% to Lawson, white votes—50.5% to Geyer; (2) 1986 Dobbs–Moore Runoff election: black votes—54.4% to Dobbs, white votes—50.4% to Moore; and (3) 1986 Wangemann–Waters election: black votes—52.2% to Waters, white votes—52.8% to Wangemann. In two of the three arguably split-preference elections, the 1986 Dobbs–Moore Runoff election and the 1986 Wangemann–Waters election, the candidate of choice of black voters lost. In one of the three arguably split-preference elections, the March 7, 2000 Geyer–Lawson election, the candidate of choice of black voters won.

In four of the eleven endogenous elections, specifically the 11/07/00 Ellard–Miller–Musselwhite election, the 1990 Hamrick–Williams election, the 1989 Baker–West election, and the 1985 Allison–Canupp–Lawson election,[15] black and white voters preferred the same candidate. Needless to say, the same-preference candidates won each election.

In the 1986 Bearden–Dobbs–Moore election, which resulted in the Dobbs–Moore Runoff election, no preference was established for black or white voters. But as noted previously, the two candidates who proceeded to the runoff were the two candidates preferred by black and white voters. If regarded as anything, this election would be a same-preference election. The candidates garnering the most support from black and white voters certainly did not lose.

### C. *Legal Significance of Election Evidence*

█ To establish the third *Gingles* factor, a plaintiff must show not only

---

**15.** The court notes that the winner Lawson received 50.1% of the white vote and 72.7% of the black vote. Because there were three total candidates in this election, and because the other candidates, Allison and Canupp, received 37.8% and 12.1% of the white vote respectively, the court finds that Lawson, by receiving 50.1% of the white vote, was the candidate of choice of white voters.

that whites vote as a bloc, but also that white bloc voting *regularly causes* the candidate preferred by black voters to lose; in addition, plaintiffs must show not only that blacks and whites sometimes prefer different candidates, but that blacks and whites *consistently prefer* different candidates.

*Johnson v. Hamrick,* 196 F.3d 1216, 1221 (11th Cir.1999) (emphasis added). Eleventh Circuit case law has suggested that elections involving black candidates may be most probative in determining vote dilution. See *Nipper v. Smith,* 39 F.3d 1494, 1539–40 (11th Cir.1994) (plurality as to the result and plurality in part as to the opinion) (Tjoflat, C.J.), where Judge Tjoflat agreed with the Fifth Circuit's conclusion in *Westwego Citizens for Better Gov't v. Westwego,* 872 F.2d 1201, 1208 n. 7 (5th Cir.1989) (emphasis added) that "the evidence most probative of racially polarized voting must be drawn from elections including *both* black and white candidates." Judge Tjoflat then went on to conclude that "[i]t is logical, as the Fifth Circuit suggests, that the most probative evidence of whether minority voters have an equal opportunity to elect candidates of their choice is derived from elections involving black candidates." *Nipper,* 39 F.3d at 1540. He explained that "[i]n holding as we do, however, we do not foreclose the consideration of electoral races involving only white candidates where the record indicates that one of the candidates was strongly preferred by black voters." *Id.* In *Davis v. Chiles,* 139 F.3d 1414, 1418 n. 5 (11th Cir.1998), *cert. denied,* 526 U.S. 1003, 119 S.Ct. 1139, 143 L.Ed.2d 208 (1999), the Eleventh Circuit confirmed that "[a]lthough evidence drawn from elections involving black candidates is more probative in Section Two cases, an analysis of split-preference elections is also appropriate and relevant."

Nevertheless, in the 1999 opinion of the Eleventh Circuit in this case, the court seemed to back away from the indication that elections involving black candidates are inherently more probative than other elections when it stated as follows: "We do not mean to imply district courts *should* give elections involving black candidates more weight; rather, we merely note that in light of existing case law district courts may do so without committing clear error." *Johnson v. Hamrick,* 196 F.3d at 1221–22. The court further noted that it " 'will not automatically assume that the black community can only be satisfied by black candidates.' " *Id.* at 1222 n. 6 (quoting *Askew v. City of Rome,* 127 F.3d 1355, 1378 (11th Cir.1997)). See also *City of Carrollton Branch of the NAACP v. Stallings,* 829 F.2d 1547, 1557 (11th Cir.1987) (citations omitted), where the Eleventh Circuit explained that "what is at least clear from the Court's opinion [in *Gingles* ], is that racial bloc voting does not depend on the success or defeat of a particular candidate. Under Section 2, it is the status of the candidate as the chosen representative of a particular racial group, not the race of the candidate that is important."

Additionally,

[b]ecause loss of political power through vote dilution is distinct from the mere inability to win a particular election, a pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences legally significant polarization than are the results of a single election. Also for this reason, in a district where elections are shown usually to be polarized, the fact that racially polarized voting is not present in one or a few individual elections does not necessarily negate the conclusion that the district experiences

legally significant bloc voting. Furthermore, the success of a minority candidate in a particular election does not necessarily prove that the district did not experience polarized voting in that election; special circumstances, such as the absence of an opponent, incumbency, or utilization of bullet voting, may explain minority electoral success in a polarized contest.

*Thornburg v. Gingles,* 478 U.S. 30, 57, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

■ Lastly, the court notes that although exogenous elections are less probative than endogenous elections, they may be properly considered.

### D. *Analysis*

### 1. *Election evidence indicating white bloc voting*

■ As an initial matter, the court notes that there were no endogenous elections involving a black candidate versus a white candidate. However, there were two black versus black elections.

The court finds the strongest evidence supporting a finding of white bloc voting to be the fact that the preference of black voters was defeated in both of the only elections involving black candidates and said elections reflected the most polarized voting data of all endogenous elections.

The 1990 and 1995 Johnson–Morrow elections, wherein John Morrow, a black male incumbent, defeated plaintiff Rose Johnson, a black female, were the only elections involving black candidates. These two elections present the most polarized voting data. In 1995, Morrow was supported by 94.6% of the white voters

while Johnson was supported by 69.7% of the black voters. In 1990, Morrow was supported by 86.8% of the white voters while Johnson was supported by 66.2% of the black voters.

Morrow was initially elected to his council position in 1978, at which time he defeated the Reverend C.T. Hester. Both were black males.[16] Morrow held the seat continuously and faced no electoral opposition until 1990 when, as indicated above, he defeated Johnson, a black female. During his tenure, Morrow served at least two terms as the mayor of Gainesville.

In *Abrams v. Johnson,* 521 U.S. 74, 93, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997), the Supreme Court recognized that *Gingles* "indicated that incumbency is a 'special circumstanc[e]' to be taken into account in evaluating racial bloc voting[.]" Many cases regard incumbency as a special circumstance that may explain minority success but is not relevant to explain white bloc voting. *See e.g., Nipper v. Smith,* 39 F.3d 1494, 1539–40 (11th Cir.1994) (plurality as to the result and plurality in part as to the opinion) (Tjoflat, C.J.); *Collins v. City of Norfolk,* 883 F.2d 1232, 1243 (4th Cir.1989). However, the proper analysis of each Voting Rights Act case turns on the peculiar facts of each case and is determined on a case-by-case basis. Considering Morrow's history on the Gainesville City Council, his incumbency may indeed have played a factor in his re-election and support by white voters.

As an additional note to the relevancy of the two black versus black elections, the court observes that they involved the same two candidates. Because the 1990 and 1995 elections involved the same candidates, they are not necessarily two inde-

---

**16.** There is no election data of record as to the Morrow–Hester election.

pendent legally significant votes; they may be merely duplicative.

Thus, the court finds the fact that the candidate of choice of black voters was defeated in the only two elections involving black candidates, which also presented the two most polarized election results, could cut two ways: either (1) that in an election where the candidates were black, white voters voted as a bloc to defeat the black voters' preference, or (2) white voters simply voted for the incumbent candidate in 1990 and simply continued their support for the incumbent and repeated that vote in 1995. Because there is no evidence, testimonial or otherwise, supporting either conclusion, the court finds that these two elections ultimately are not more probative than the other endogenous elections. When viewed in conjunction with the most recent election evidence and the election evidence as a whole, these two instances of polarized voting appear isolated. There is nothing to indicate that these elections were part of or started a trend.

Other evidence supporting a finding of white bloc voting is the fact that the candidate of choice of black voters lost three of three clearly-established split preference elections. However, the court notes that two of those elections were the Johnson–Morrow elections, which may have been duplicative, isolated, and a result of incumbency as discussed above.

Additionally, the candidate of choice of black voters lost two of the three arguably split-preference elections. However, the candidate of choice of black voters did prevail over the candidate of choice of white voters in one of the three elections. Moreover, the fact that the percentages of "preference" in these cases were very close could indicate that the interests of the black and white communities may be merging instead of indicating white bloc voting.

### 2. *Election evidence indicating no white bloc voting*

The strongest evidence against a finding of bloc voting is the fact that the overall election evidence shows that the candidate of choice of black voters prevailed in 45.5% of the endogenous elections. Thus, it does not appear that the white majority *usually* defeats the candidate preferred by black voters. Indeed, the candidate preferred by black voters wins as often as he or she loses, 45.5% of the time.

The candidate of choice of black voters defeated the white voters' candidate of choice in one of three arguably split-preference elections. However, the court notes that the black preference in that election, Lawson, was also the incumbent. That "special circumstance" diminishes the relevance of that black preference win.

Seven of the 11 elections demonstrate that the interests of the black and white communities may be merging. In four elections, black and white voters preferred the same candidate. In three other elections, the numbers were so close that although the winning candidate was "preferred" by the white voters, the white preference was a bare majority, 50.4% and 52.8%, and the black voters supported the winning candidate in high numbers as well, 45.6% and 47.7%.

The exogenous election evidence, while not as probative as the endogenous election evidence, also indicates that the black vote is not usually defeated.

### 3. *Conclusion*

The court finds that plaintiffs have not satisfied the third *Gingles* prong. The

factors which indicate white bloc voting all have countering factors which could cut against that finding. The overall endogenous election evidence indicates that white bloc voting did not *usually* defeat the candidates preferred by black voters. Indeed, the candidates preferred by black voters won as often as they lost, 45.5% of the time. That conclusion is supported by the less probative exogenous election evidence as well. Lastly, seven, or 63.6%, of the 11 elections demonstrate that the interests of the black and white communities may be merging and that blacks and whites do not *consistently* prefer different candidates.

## VI. *Totality of the Circumstances*

Because the court has found that plaintiffs have failed to satisfy the three prongs of *Gingles,* the court's inquiry is at an end, and it need not consider the totality of the circumstances. *See Johnson v. Hamrick,* 196 F.3d 1216, 1220 (11th Cir.1999) ("If one or more of the *Gingles* factors is not shown, then the defendants prevail. If all three factors are shown, then the district court must review all relevant evidence under the totality of the circumstances."). However, the court does note a few circumstances which support the conclusion that § 2 has not been violated: There is no evidence that political campaigns have been characterized by overt or subtle racial appeals. A black individual has been elected to represent Ward 3 continuously since 1978. Having one black council member of a total of five amounts to 20% representation. In 1990, blacks constituted 23.5% of the total population and 20.24% of the voting age population. As of the 2000 Census, blacks now constitute 15.7% of the total population and 14.2% of the voting age population. Thus, currently, blacks are more than proportionally represented on the Gainesville City Coun-

cil. Additionally, there has been no evidence submitted of racial bias in the voting community.

## VII. *Plaintiffs' Constitutional Claims*

Plaintiffs have contended that the electoral system for the Gainesville City Council violates the Fourteenth and Fifteenth Amendments to the United States Constitution. This court has previously declined to consider the merits of these claims. However, as plaintiffs have lost herein on their § 2 claim, it is now appropriate to consider the constitutional claims.

Defendants argue that plaintiffs have abandoned these claims. Plaintiffs have not briefed the constitutional claims or included them in their proposed findings of fact and conclusions of law. Thus, the court agrees that they appear to have been abandoned. However, to be thorough, the court notes that plaintiffs have failed to prove their constitutional claims.

■ Previously, plaintiffs claimed that Gainesville has intentionally maintained the current at-large system for the discriminatory purpose of diluting black voting strength in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution. Such a claim requires proof of discriminatory purpose and effect. *See Burton v. City of Belle Glade,* 178 F.3d 1175, 1189 (11th Cir.1999); *Askew v. City of Rome,* 127 F.3d 1355, 1373 (11th Cir. 1997). Discriminatory intent may be established through direct or indirect circumstantial evidence. *See Hall v. Holder,* 117 F.3d 1222, 1225–26 (listing relevant, although not exclusive, factors).

The court finds plaintiffs have not proved that Gainesville's at-large system was maintained for discriminatory purposes. Instead, the court finds that the

following factors indicate otherwise. First, the overall evidence does not show racially polarized voting. Second, there is no evidence that Gainesville's current city council members are racists. There is evidence of record that the city council members are responsive to the black community and that many of them have been supported by the black community. Third, the court is convinced that many members of the city council sincerely believe that the at-large election system is the best system for Gainesville. See this court's 1994 order, p. 7–8, regarding the testimony of each city council member. They each testified to their

> unyielding belief in the benefits of the at-large electoral system. The principal benefit, cited without exception by each member, was the fact that in such a system every citizen of the city is a constituent of each council member. Because every citizen can vote for every member there is far less parochialism than in a single member district system in which there is a tendency for representatives to cater to the interests of their particular district at the expense of others. Further, the council members were unanimous in testifying that they solicited and received black, as well as white, support in each campaign and that they knew of no discrimination or impediment to black electoral participation. The city manager, Al Crace, testified regarding numerous programs which the city has adopted which directly benefit the residents of Ward 3, a predominantly black community. These include, among others, surface pavement improvement, community policing and the development of a community service center. Significantly, the city manager also testified that Gainesville's attorneys had advised the city that it lacked the power to issue a moratorium on new industry which may contribute to the

environmental concerns of Ward 3 residents, and that certain of these areas were both geographically and legally beyond the scope of city control. Carlyle Cox, the assistant city manager, testified as to efforts the city has made in applying federal, state and local funds to improve housing conditions for certain lower income residents. The residents of Ward 3 have been among the largest beneficiaries of these programs.

1994 order, p. 7–8 [89–1]. Fourth, political participation of the black community has not been suppressed. Although the black voting age population of proposed Ward 3 would be 47.6% of the total voting age population, black registered voters would amount to 77.3% of the total registered voters.

The court concludes that Gainesville's at-large method of electing the city council is not maintained for discriminatory purposes. Thus, plaintiffs' claims under the Fourteenth and Fifteenth Amendments to the United States Constitution fail.

## VIII. *Conclusion*

This court recognizes the agonizing history and changing evidence in this case as evidenced by the differing outcomes of previous rulings. Nevertheless, the court is convinced, based upon its searching examination of the past and present reality, the evidence, and the circumstances in this case, that the plaintiffs, in 2001, are not able to prove that the at-large electoral system used to elect the Gainesville City Council violates § 2 of the Voting Rights Act or the Fourteenth and Fifteenth Amendments to the United States Constitution. Accordingly, the court ORDERS that final judgment be entered in favor of the defendants.